**CSC HOLDINGS, INC. Plaintiff,**

v.

**J.R.C. PRODUCTS, INC., et al.[1] Defendants.**

**No. 99 C 3516.**

United States District Court, N.D. Illinois, Eastern Division.

Dec. 17, 1999.

1. The defendants are J.R.C. Products, Inc., Omega Holdings LLC, Teleview Inc., Teleview Distributors, Inc., Frank P. Redisi, Jr., Frank P. Redisi, Sr., Lance Rentlo, Rec–Tec Electronics, Inc., James Recchia, Frank Recchia, Joann Recchia, Elisa Recchia, Anthony Recchia, Robert Recchia, Nora Recchia, John Does 1–10, Jane Does 1–10, Unidentified Corporation 1–10, Unidentified Business Entities 1–10, Omega of Elgin, Inc., and C & G Electronics, Inc.

Daniel J. Lefkowitz, P.C., Jericho, NY, (by Daniel J. Lefkowitz, Patrick J. Sullivan and Wayne R. Louis), Ronald S. Safer, Schiff, Hardin & Waite, Chicago, IL, (local counsel) for plaintiff CSC Holdings, Inc.

James Recchia, Frank Recchia, Joann Recchia, Elisa Recchia, Anthony Recchia, Robert Recchia and Nora Villalobos, Wolin & Rosen, Chicago, IL, (by Jeffrey Schulman), for defendants J.R.C. Products, Inc., Rec-Tec Electronics, Inc., C & G Electronics, Inc.

Frank Redisi, Sr., Frank Redisi, Jr., Freeborn & Peters, Chicago, IL (by Fred Forman, Anthony Carballo and Aren L. Fairchild), for defendants Teleview Inc., Teleview Distributors, Inc., Omega Holdings, LLC, and Omega of Elgin, Inc.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

The plaintiff, CSC Holdings, Inc. ("Cablevision"), seeks injunctive relief and monetary damages against seven business defendants and nine individual defendants (collectively "defendants") for the alleged sale of "pirate" cable television decoders in violation of the Cable Communications Policy Act of 1984, 47 U.S.C. § 553, and various state laws. Currently before the Court is Cablevision's motion for summary judgment on the claims brought under § 553, and a cross motion for summary judgment by two of the individual defendants. The Court grants Cablevision's summary judgment motion as to the liability of all defendants except Anthony Recchia, who we dismiss from the case. We deny the Redisis cross motion for summary judgment.

## RELEVANT FACTS

The following facts are derived from the parties' Local General Rule 12 statements and evidentiary materials submitted to the Court in connection with the pending summary judgment motions.

### A. The Plaintiff and Its Business

Cablevision provides cable television services in New York, Connecticut, Massachusetts, New Jersey, Ohio and Michigan. It offers a variety of programming packages to its subscribers, including basic, premium and pay-per-view services. Cablevision's subscribers receive a "converter," which changes cable signals into viewable programming. To prevent subscribers from receiving services that they have not paid for, Cablevision encodes or scrambles the signals for its premium and pay-per-view programming. Only those subscribers who purchase these services are provided with a converter containing a "decoder." Cablevision's programming, however, can be illegally received by non-subscribers with the use of a "pirate decoder," which unscrambles encoded programming.

### B. The Plaintiff's Investigation of the Defendants

In March 1998, Cablevision commenced an investigation to determine if the defendants were selling pirate decoders in Cablevision's system areas. The initial investigation consisted of reviewing information from public filings regarding the nature of the defendants' businesses and their principals. Cablevision also took photographs at the defendants' business locations and obtained discarded business documents which suggested that the defendants were selling pirate decoders. The public filings indicated that Teleview, Inc. ("Teleview"), Omega Holdings LLC ("Omega Holdings"), J.R.C. Products, Inc. ("JRC"), Rec–Tec Electronics, Inc. ("Rec–Tec"), and C & G Electronics, Inc. ("C & G"), were doing business at the same location and were fundamentally the same business. Furthermore, a Cablevision investigator purchased six pirate decoders by phone from the defendants between March 3, 1998 and

May 13, 1999. Cablevision found that these decoders were able to descramble all of Cablevision signals.

Based on this evidence, we granted Cablevision's ex parte request for a temporary restraining order, a preliminary injunction, expedited discovery, an order freezing the defendants' assets, an accounting, and a seizure order. (R. 6, Minute Order of May 28, 1999.) Pursuant to this order, on June 2, 1999, United States Marshals seized fifteen pirate decoders from the defendants' business. Cablevision tested the pirate decoders and all but one was capable of descrambling encoded cable television signals. The Marshals also seized computers and numerous documents including inventory lists, sales records, customer correspondence, internal memoranda, sales flyers, invoices, employee charts, and payroll checks.

## C. The Defendants

### 1. The Business Defendants

#### a. Teleview Distributors Inc., Teleview, and Omega Holdings

Teleview Distributors, Inc. ("Teleview Distributors"), Teleview, and Omega Holdings were functionally one business, located at 1520 Commercial Drive, Elgin, Illinois, operating under different names. The business, under its various names, sold pirate decoders to customers residing in Cablevision's franchise areas, and advertised their decoding devices as "bullet proof," meaning their use could not be detected by the cable company. The business first operated under the name of Teleview Distributors, then Teleview, and finally Omega Holdings. The name change was discovered when, during its investigation, Cablevision called Teleview's 800 number, ordered a pirate decoder, and was told to make the money order payable to Omega Holdings.

#### b. Omega Holdings and Omega of Elgin

In November 1998, all of Omega Holdings' assets were sold to Omega of Elgin. These assets included furniture, fixtures, tools, office supplies, telephones and computers which were sold "as is." None of the records on the computers were deleted, and sales records from Omega Holdings remained on the computers sold to Omega of Elgin.

While the Redisi defendants contest that there was a "transfer of business" between Omega Holdings and Omega of Elgin, they admit that Frank Redisi, Sr. ("Redisi Sr."), was responsible for selling Omega Holdings' assets to Omega of Elgin, including the sales records on the computers. In a letter dated November 6, 1998, Frank Redisi, Jr. ("Redisi Jr.") instructed Redisi Sr. to liquidate all of Omega Holdings' assets and to "use any proceeds to satisfy any unpaid taxes, debts, to vendors, customers, attorneys, etc. If there are any funds remaining, do with them as you wish." At the time of the sale, both Redisi Sr. and Redisi Jr. had ownership interests in Omega Holdings.

#### c. Omega of Elgin, JRC, Rec–Tec, and C & G

Omega of Elgin, JRC, Rec–Tec, and C & G were functionally the same business. They were located at 139, 141, 143 West River Road, Elgin, Illinois; they shared facilities, equipment and inventory; and they all sold pirate decoders to customers residing in Cablevision's franchise areas.

Documents seized on June 2, 1999 demonstrate that Omega of Elgin, JRC, Rec–Tec and C & G had common employees and officers including many of the named individual defendants. These documents include Omega of Elgin's weekly payroll checks and JRC employee hour charts for 1999, which both list defendants James Recchia, Frank Recchia, Joann Recchia, Elisa Recchia and Nora Villalobos as employees. Further, corporate records establish common management: a JRC Small Business Corporation 1998 document identifies defendants James Recchia, Frank Recchia, and Robert Recchia as JRC shareholders, a Rec–Tec Corporation Book lists Robert Recchia as President

and Director, and a C & G Corporation Book lists Frank Recchia as President and Secretary. Frank Recchia, James Recchia, Joann Recchia and Nora Villalobos also worked for Teleview Distributors, Teleview and/or Omega Holdings.

## 2. The Individual Defendants

### a. Redisi Sr.

Redisi Sr. admits that he had an ownership interest in Teleview Distributors, but, relying on the Fifth Amendment, refused to answer questions regarding his relationship to Teleview and Omega Holdings. Testimony by his son, Redisi Jr., and information taken from public record, however, prove that Redisi Sr. had an ownership interest in, and earned income from, Teleview and Omega Holdings, as well as Teleview Distributors.

Redisi Jr. testified that he and Redisi Sr. were owners of Teleview in November 1992 when Redisi Jr. was charged with violating § 553; that he and his father were the sole owners of Teleview between 1993 and 1995; and that either he or his father received the highest income from Teleview and Omega Holdings. He also admitted that the equipment sold by Teleview Distributors, Teleview and Omega Holdings was intended to enable customers to receive illegal cable services.

Redisi Sr. admits liquidating Omega Holdings' assets, including the computers with Omega Holdings' sales records, by selling them to Omega of Elgin and JRC in November 1998. Redisi Sr. also admits performing professional bookkeeping work for Omega of Elgin and JRC between December 1998 and April 1999.

### b. Redisi Jr.

Redisi Jr. worked for Teleview Distributors from 1990–93, for Teleview from 1993–95, and for Omega Holdings from 1995–98. Redisi Jr. admits that Teleview Distributors, Teleview and Omega Holdings were "illegal businesses" which sold pirate decoders, and that he was part owner of all three of these companies.

In November 1992, the FBI served a search warrant on Teleview, and as a result Redisi Jr. was later criminally charged with one count of violating 47 U.S.C. § 553. Redisi Jr. states that he began cooperating with the federal government sometime in 1996 as part of a plea agreement. Ultimately, Redisi Jr. pled guilty and admitted that he and his companies sold approximately 25,000 pirate decoders between February and November 1992. On November 12, 1998, Redisi Jr. was sentenced; he is currently on probation.

### c. James, Frank, and Robert Recchia

James, Frank, and Robert Recchia were the officers and shareholders of the business defendants described above. They were also employees of the corporate defendants. Each of them was present at the June 2 civil seizure, and, during their depositions, each man invoked his Fifth Amendment privilege against self-incrimination in response to every question regarding the pirate decoder business.

### d. Joann and Elisa Recchia and Nora Villalobos

Joann and Elisa Recchia and Nora Villalobos were each employees of the corporate defendants. Joann and Nora were present at the June 2 civil seizure. Elisa and Nora were telephone salespeople who sold pirate decoders to Cablevision's investigator.

### e. Anthony Recchia

The only evidence Cablevision offers against Anthony Recchia is that a vehicle registered to him was observed in the parking lot adjacent to the JRC business location on February 22, 1999, and a fax bearing the name "Anthony" was recovered at the defendants' business during the civil seizure. Anthony Recchia testified at his deposition that he had been employed for the past two and one-half years, working 40 hours per week, for a company named Cinch. During his deposition, Anthony Recchia invoked his Fifth

Amendment privilege against self-incrimination as to each question regarding the defendants' business.

## D. The Defendants' Arguments Against Summary Judgment

The defendants generally admit the illegal nature of the activities conducted by the business defendants. However, the defendants present various defenses as to their individual involvement in the alleged § 553 violations.

### 1. The Recchia Defendants

James, Frank, Robert, Joann, and Elisa Recchia, and Nora Villalobos (collectively the "Recchia Defendants") all admit that the corporate defendants sold pirate decoders to cable subscribers knowing and intending that they could use the devices to receive scrambled premium and pay-per-view programming services without paying Cablevision. The Recchia Defendants also admit that the businesses advertised their devices as "bullet proof" and "non-detectable," meaning that they could not be detected by the cable operator servicing the area where the device was to be used.

The Recchia Defendants, plus Anthony Recchia, filed a joint statement of opposition to Cablevision's summary judgment motion. They claim that Cablevision knew or should have known about the alleged illegal activities as early as 1991, and argue that a two-year statute of limitations bars this action. Additionally, they maintain that joint and several liability may not be imposed against them in this case.

Several of the Recchia Defendants assert individual defenses as well. Anthony Recchia contends that he was not involved with any of the defendant companies. Joann Recchia and Nora Villalobos claim only that they did not have management positions at any of the defendant companies. Elisa Recchia and Robert Recchia assert they were not involved with any of the companies prior to late 1998. Finally, Frank Recchia asserts that he did not work for the defendant businesses between 1996 and 1998.

### 2. The Redisi Defendants

Redisi Sr., and Redisi Jr., (collectively the "Redisi Defendants"), also filed a joint statement of opposition to Cablevision's summary judgment motion. Moreover, they filed a cross motion for summary judgment.

The Redisi Defendants claim that Cablevision knew, or should have known, about the alleged cable piracy activities since the early 1990's and, therefore, Cablevision's claims are barred by a two-year statute of limitations and the doctrine of laches. They also argue that Cablevision has not identified a violation of § 553 by Redisi Sr. Finally, they contend that because of his plea agreement, Redisi Jr. was an agent of the government between 1996 and 1998, and therefore that he is entitled to immunity for any violations of § 553 that he may have committed during that time period.

### E. Cablevision's Arguments Against the Cross Summary Judgment Motion

Cablevision argues that it did not have actual knowledge of its cause of action before it began its current investigation of the defendants in March 1998. Cablevision maintains that any general suspicion it might have had at an earlier date that defendants were selling pirate decoders was insufficient to start the applicable statute of limitations period. Further, Cablevision asserts that the defendants' actions represent a continuing violation, making the present action timely regardless of the applicable statute of limitations. Cablevision argues that the undisputed facts establish Redisi Sr.'s involvement in the alleged illegal activity. Finally, Cablevision maintains that Redisi Jr. was not an employee or agent of the federal government and cannot claim immunity.

### THE RELEVANT STATUTE

Cablevision seeks summary judgment only on its claims arising under the Cable Communications Policy Act, 47 U.S.C.

§ 553. Section 553 provides in pertinent part,

(a)(1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

(a)(2) For the purpose of this section, the term "assist in intercepting or receiving" shall include the manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).

The defendants rely heavily on the statute of limitations set forth in 47 U.S.C. § 415, which provides:

(a) All actions at law by carriers for recovery of their lawful charges, or any part thereof, shall be begun within two years from the time the cause of action accrues, and not after.

(b) All complaints against carriers for the recovery of damages not based on overcharges shall be filed with the Commission within two years from the time the cause of action accrues, and not after, subject to section (d) of this section.

## LEGAL STANDARDS

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir.1994). A genuine issue for trial exists only when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, and draw all reasonable inferences from the evidence in the nonmovant's favor. *Cincinnati Ins.*, 40 F.3d at 150. However, if the evidence is merely colorable, or is not significantly probative, or merely raises some metaphysical doubt as to the material facts, summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 261, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505.

Where cross motions for summary judgment have been submitted, the court is not required to grant judgment as a matter of law for one side or the other. *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993). The court must evaluate each party's motion on its own merits, resolving factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. *Id.; Buttitta v. City of Chicago*, 803 F.Supp. 213, 217 (N.D.Ill.1992), *aff'd*, 9 F.3d 1198 (7th Cir.1993).

## DISCUSSION

### A. Liability Under 47 U.S.C. § 553

Section 553 prohibits the manufacture and distribution of pirate encoders. Individuals, as well as corporations, can be liable for violations of § 553. *See generally United States v. Norris*, 88 F.3d 462 (7th Cir.1996); 47 U.S.C. §§ 553(a) and (c). A violator's intent is irrelevant to the question of liability; rather, intent goes to the appropriate level of damages. 47 U.S.C. § 553(c)(3)(B) and (c)(3)(C).

### 1. Evidence of Defendants' Unauthorized Distribution of Pirate Cable Decoders

Undisputed evidence in the record shows that the corporate defendants, with-

out authorization, distributed pirate decoders for the sole purpose of enabling their customers to illegally intercept Cablevision's cable services without paying. The record is replete with evidence which overwhelmingly demonstrates this fact. The defendants' own statement of facts conclusively establishes that the business defendants sold pirate decoders to customers residing in Cablevision's franchise areas, and that their devices were specifically advertised as undetectable by Cablevision.

Each of the individual defendants, with the sole exception of Anthony Recchia, was sufficiently involved with one or more of the businesses to satisfy the low threshold for liability required by the statute. As to the Recchia Defendants, James, Frank and Robert Recchia were officers, employees, and shareholders of the various defendant businesses, and were present at the civil seizure. Joann and Elisa Recchia, and Nora Villalobos were employees of the various defendant businesses and received weekly pay checks from them. Joann and Nora also were present at the civil seizure. The record evidence implicates both Elisa and Nora as telephone salespersons who sold pirate decoders to Cablevision's investigators for use in Cablevision's franchise areas to intercept cable services without payment or detection.

Similarly, the Redisi Defendants had ownership interests in Teleview and Omega Holdings, and were the sole owners of the Teleview entities from at least 1991 to 1995, during which time Redisi Jr. was charged with violating § 553 in connection with Teleview's illegal business activities. Redisi Jr. admitted that the pirate decoders were intended to enable customers to receive cable programming without paying for it. Both Redisis received significant income from Teleview and Omega Holding, which Redisi Jr. testified grossed millions of dollars in the years he worked there. Redisi Jr. admits working for the Teleview and Omega entities from 1990 to 1998. In November 1998, Redisi Sr. liquidated all the assets of Omega Holdings to Omega of Elgin and JRC, and he received JRC checks in payment for Omega Holdings'

assets. Redisi Sr. performed bookkeeping services for Omega of Elgin and JRC between December 1998 and April 1999 following this sale.

The facts in the record indicate that each of the Recchia and Redisi Defendants, except for Anthony Recchia, was sufficiently involved with the defendant businesses as officers, managers, shareholders, and/or employees to hold them individually liable for assisting in the unauthorized interception or reception of cable services under the statute.

■ Furthermore, we may infer involvement in the illegal activities by the individual defendants from their invocation of their Fifth Amendment privilege against self-incrimination. Unlike criminal cases, where no adverse inference may be drawn from a defendant's refusal to testify, in the civil arena, the trier of fact is permitted to draw an adverse inference from a party's refusal to testify. *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). While a refusal to testify, in itself, is insufficient to support an adverse finding against a defendant, when coupled with other evidence, the trier of fact may draw an adverse inference from the fact that a defendant invoked the Fifth Amendment. *Id.; see also LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 390 (7th Cir.1995).

The Seventh Circuit, however, has cautioned that an adverse inference drawn from a defendant's assertion of the Fifth Amendment in a civil case cannot rest solely on the silence. *See, e.g., LaSalle Bank,* 54 F.3d at 391 (A defendant's refusal to testify should "be weighed in light of other evidence rather than leading directly and without more to the conclusion of guilt or liability."); *see also National Acceptance Co. of Am. v. Bathalter,* 705 F.2d 924, 932 (7th Cir.1983). Thus, a defendant's claim of privilege is not properly deemed an admission of the entire complaint. Instead, a plaintiff must be "put to its proof, either by way of evidentiary support for a motion for summary judgment

or a trial." *National Acceptance,* 705 F.2d at 932. In this case, the record contains sufficient supporting evidence to reasonably draw adverse inferences about each individual defendant's liability under § 553 (with the exception of Anthony Recchia and Redisi Jr., who did not refuse to testify) from their Fifth Amendment invocations.

The record evidence overwhelmingly establishes that the corporate defendants, the Redisi Defendants, Nora Villalabos, and James, Frank, Joann, Elisa, and Robert Recchia are liable to Cablevision for violating § 553. For this reason, we grant Cablevision's summary judgment motion with regard to these defendants.

On the other hand, Cablevision's evidence against Anthony Recchia is sorely lacking. No evidence ever tied him, directly or indirectly, to any § 553 violation. The only evidence against Anthony Recchia is that he invoked his Fifth Amendment privilege, his car was once seen parked outside of a corporate defendant, and a fax bearing the name "Anthony" was recovered during the civil seizure. This simply is not enough to show that Anthony was involved in the other defendants' sale of pirate decoders. *See National Acceptance,* 705 F.2d at 932.

### B. Defendants' Affirmative Defenses

The defendants have proffered several affirmative defenses, all of which we reject for the reasons stated below.

#### 1. Statute of Limitations Defense

The defendants argue that Cablevision's § 553 claim is barred by a two year statute of limitations because Cablevision either knew or should have known of its injury as early as 1991 and did not file suit until 1999. Even assuming that the defendants correctly identify 47 U.S.C. § 415 as the source of the governing limitations period, we reject the defense for two reasons. First, there is nothing in the record to indicate that Cablevision was put on notice of injury by these specific defendants until it began its own investigation of them in

1998. Second, the defendants' § 553 violations were ongoing from at least 1991 until this action was filed in 1999 and, therefore, under the continuing violation doctrine, this action was timely filed.

█ The defendants argue that several activities and events occurring between 1991 and 1996 should have put Cablevision on notice of its cause of action. For example, in 1991 Cablevision sent letters to various companies across the country, including at least one owned by Redisi Jr., warning them to cease and desist if they were selling pirate decoders in Cablevision's market areas. These letters, however, do not reflect specific knowledge by Cablevision that Teleview, or any of the other recipients, was actually selling pirate decoders in its market areas. At most, these letters reflect speculation or mere suspicion that the defendants may have been selling pirate decoders. *Sokol Crystal Prods., Inc. v. DSC Communications Corp.,* 15 F.3d 1427, 1430 (7th Cir.1994) (a party is not required to bring suit based on mere suspicions that it might be suffering damages).

█ The defendants next claim that, because Cablevision had an ongoing relationship with the FBI, it should have known about its cause of action against Teleview. Specifically, the defendants argue that Cablevision was put on notice of Teleview's violation when the FBI executed a search warrant on Teleview and seized several pirate decoders in 1992. We disagree; the FBI's search of Teleview, at most, notified Cablevision, as well as other cable companies, that the FBI was investigating Teleview—a company which could have been ripping off any number of cable companies. The simple fact that the FBI seized numerous pirate decoders did not put Cablevision on notice that it was definitely one of the companies being ripped off. Furthermore, based on the FBI's actions, Cablevision could have reasonably concluded that Teleview was now out of the cable piracy business because of the FBI investigation and seizure. Cablevision was not

required to investigate further at that point, and certainly could not be expected to surmise that the defendants would have the audacity to change their name and go right back into the cable piracy business, despite the FBI's actions.

■ The defendants also state that between 1991 and 1995 they advertised their products in national magazines. Again, at most, the advertisements gave Cablevision an awareness that the defendants were participating in a national illegal market; the ads did not, however, give Cablevision specific notice of a particular violation against it. This precise argument was rejected by the District Court of Arizona in *Time Warner Cable v. Cable Box Wholesalers, Inc.*:

> Defendants argue that the plaintiff should have been aware of Cable Box's conduct because of the defendants' widespread magazine advertising of decoders for sale. This argument suggests that defendants' cable piracy activity was so open and notorious that what was taking place should have been obvious to plaintiff. Sale of decoders is not an uncommon occurrence. The decoders sold by the defendants, however, were modified to enable purchasers to intercept plaintiff's cable signals. There is no evidence that the plaintiff knew or should have known of this fact.

920 F.Supp. 1048, 1053 (D.Ariz.1996).

■ Furthermore, the defendants had reason to actively conceal their illicit activity from Cablevision, and the product itself contained features for the purpose of avoiding detection by Cablevision. Such concealment tolls a statute of limitations. *Hochfelder v. Ernst & Ernst*, 503 F.2d 1100 (7th Cir.1974) ("[W]here a fraud which is the foundation of the suit has been actively concealed or is of such a nature as to conceal itself, the statute of limitations is tolled until the plaintiff has obtained knowledge of the fraud or in the exercise of due care should have obtained knowledge of the fraud."). Under these circumstances, the defendants' statute of limitations defense must fail.

### 2. Doctrine of Laches

■ The defendants argue that Cablevision's claims are barred by the doctrine of laches because Cablevision's delay in bringing this claim has caused the defendants undue prejudice. A court may exercise its discretion to grant a laches defense when a defendant's ability to defend is impaired by the plaintiff's inexcusable delay in bringing the lawsuit. For example, a laches defense may be appropriate when the delay results in the loss of evidence or witnesses.

In *Sokol*, however, the Seventh Circuit rejected the defendants' laches defense for the same reason it rejected the statute of limitations argument: Sokol was not required to bring suit when it merely suspected that it was being injured by the defendant. *Sokol*, 15 F.3d at 1430. The same reasoning applies here. Because the Court finds that Cablevision brought this action in a timely manner without intentional delay, the Court finds that the doctrine of laches does not apply.

Furthermore, laches is an equitable doctrine that requires the party claiming its benefit to come to court with clean hands. According to the evidence in this case, including the defendants' own testimony, the defendants' hands are far from clean: they admit knowingly violating § 553 over an extended period of time, and regularly changed corporate names to avoid detection. Furthermore, any prejudice resulting from lost evidence will probably affect both parties equally during the damages phase of this action. For these reasons, we reject the defendants' laches defense.

### 3. Governmental Immunity Claim of Redisi Jr.

Redisi Jr. claims that he was an employee of the federal government and an agent of the FBI between 1996 and 1998, and is therefore entitled to immunity during that period. He claims that his activities at Omega Holdings, including the sale of pirate decoders into Cablevision's market areas, were at the direction and behest of the

FBI, and on this basis seeks to avoid liability for the illegal activities of Omega Holdings which he admits transpired during that time.

 The burden of establishing an immunity defense is on the person claiming that defense; Redisi Jr. has not met that burden. The only evidence he offers to support his claim that he was a government agent is the plea agreement and his own unsupported testimony that he was a government agent. The plea agreement, however, does not mention any cooperation arrangement and does not state that Redisi Jr. would be immune for violations of any kind. To the contrary, the agreement specifically states

> This plea agreement concerns criminal liability only, and nothing herein shall limit or in any way waive or release any administrative or judicial claim, demand or cause of action, whatsoever, of the United States or its agencies. Moreover, this Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this agreement.

Additionally, Redisi Jr. has not produced any evidence that he is a government employee as that phrase is used in 28 U.S.C. § 2671 and *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). For these reasons, Redisi Jr. cannot succeed on his immunity defense.

### CONCLUSION

For the foregoing reasons, Cablevision's claims against Anthony Recchia are dismissed with prejudice. Cablevision's summary judgment motion is granted as to all remaining defendants. The Redisi Defendants' joint motion for summary judgment is denied.

In accordance with this opinion judgment is entered on liability against all

remaining defendants. The Court will retain jurisdiction to consider the issue of damages. Cablevision is directed to file a proposed litigation plan to deal with remaining issues in this case by January 4, 2000. The defendants may file a written response on or before January 7, 2000. As previously ordered, a status hearing will be held on January 10, 2000 at 9:45 a.m. to set a firm litigation schedule for the remaining damages issues in this lawsuit.